FILED'06 JUN 29 11:50USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THEODORE R. FORD, M.D.,          )
                                 )
        Plaintiff,               )          Civil No. 03-6256-TC
                                 )
        v.                       )          ORDER
                                 )
CASCADE HEALTH SERVICES, an      )
Oregon corporation; BEND         )
ANESTHESIOLOGY GROUP, P.C., an   )
Oregon professional corporation; JAMES )
A. DIEGEL; STEVEN W. CROSS, M.D.; )
DANIEL J. MURPHY, M.D.; and      )
MICHAEL E. PRICE, M.D.,          )
                                 )
        Defendants.              )
_____)

COFFIN, Magistrate Judge.

        Presently before the court are defendant Bend Anesthesiology Group's motion (#104) for

summary judgment, and defendants Cascade Health Services, Steven Cross, James Diegel, Daniel

Murphy, and Michael Price's motion (#105) for summary judgment.

        1 - ORDER

## BACKGROUND

Based on the amended complaint, as well as the affidavits, declarations, and exhibits on file, and viewed in the light most favorable to the plaintiff, the following is a synopsis of the salient facts underlying this case.

Dr. Ford, who is Asian and African-American, is a trained and licensed anesthesiologist who was a member of the Redmond, Oregon Central Oregon District Hospital's ("CODH") medical staff from 1995 to 2001.[1]  In 2000, plaintiff was offered and accepted a position as Medical Director of CODH's Department of Anesthesia.

In 2000, following the announcement of a merger of the Redmond hospital and St. Charles Medical Center, various meetings were held between defendant Bend Anesthesia Group ("BAG") and representatives of the Redmond hospital's medical staff regarding the benefits of Certified Registered Nurse Anesthetists ("CRNAs") versus MD anesthesiologists and the future of anesthesia services at the Redmond hospital.  BAG had for several years been the predominate - and essentially, but not completely, exclusive -  provider of anesthesiology services for St. Charles.[2]  Management of what would become Cascade Health Services wanted BAG to extend those services to the Redmond hospital.  Records show that plaintiff attended several of these meetings, but others were

---

[1]CODH subsequently became Central Oregon Community Hospital ("COCH"), which on January 1, 2001 consolidated with St. Charles Medical Center, a hospital in Bend, Oregon.  The assets and liabilities were combined into an umbrella corporation, Cascade Health Services ("CHS"), and CODH was renamed.  Recently, Cascade Health Services has been renamed Cascade Healthcare Community, and COCH is now referred to as the Redmond campus of St. Charles.  In referring to the Redmond hospital, the court will use the terms "CODH," "COCH," "Redmond hospital," and "Redmond campus" interchangeably.

[2]Although it is clear that BAG provided the lion's share of anesthesiology services to St. Charles, plaintiff, as an M.D. anesthesiologist with active privileges at the Redmond hospital, also had visiting privileges at St. Charles, and apparently provided services there at least occasionally.

2 - ORDER

held without his attendance.  In some of those meetings, hospital management pushed for BAG to agree to a contract or exclusive contract to provide such services to Redmond, alongside one or more CNRAs, but an exclusive contract was never agreed upon.   These meetings, and related communications, continued for almost two years, and in late December, 2001, CHS and BAG signed a Memorandum of Understanding for the provision of M.D. anesthesiology services at the Redmond hospital.

On August 31, 2001, plaintiff met with COCH's Senior Vice President of Operations, defendant James Diegel, and COCH's Vice-President of Patient Care Services, Pam Steinke, to discuss the renewal of plaintiff's contract as Medical Director of the anesthesia department.  During that meeting, a discussion was held regarding whether the service of anesthesia at COCH would be privatized and whether additional CRNAs or MD anesthesiologists were going to be hired.[3] Subsequent to that meeting, plaintiff solicited and received applications from MD anesthesiologists interested in forming an MD anesthesia group which would have competed with BAG.  The plan to form an MD anesthesia group was announced by plaintiff and the chair of COCH's surgical services committee in September, 2001.

In late October, 2001, some staff members voiced concerns to hospital management about what they perceived as inappropriate comments and humor used by plaintiff.   These concerns were not fully investigated, nor was plaintiff ever given a letter of reprimand or a "follow-up note" as required by hospital policy for action taken on the basis of a complaint against him.  However, on October 26, 2001, plaintiff was provided a letter from COCH which informed him that his staff

---

[3]Plaintiff had previously discussed with COCH administration whether an all-MD anesthesia staff would be in the best interests of the hospital.  He had begun setting the groundwork for the formation of an MD anesthesia group at COCH.

3 - ORDER

privileges at COCH, which were set to expire on October 28, 2001, were not going to be renewed, that his position as Medical Director was being terminated, and that "serious allegations have been filed with this office concerning [his] conduct at the hospital."

On October 27, 2001, plaintiff met with Diegel, and with defendant Steven Cross, M.D., who was President of the COCH Medical Staff. Plaintiff was informed of the complaint against him, and was re-informed of the expiration of his hospital privileges and of his termination as Medical Director. Plaintiff inquired whether he would be able to have staff privileges at COCH, and Diegel informed him that he if applied for temporary staff privileges, that application would be denied, and the denial would be reported to the National Practitioner Data Bank.[4] However, Diegal told plaintiff that he would expedite the process with the Credentials Committee and that as part of the credentialing process the committee would be told of the investigation into the staff complaint(s). Plaintiff was told that if he chose to resign and withdraw his application for reappointment to the medical staff, the "problems" would go away and no adverse reporting would be made to the NPDB or put in his official medical staff file. Under this pressure, plaintiff withdrew his application for reappointment to the medical staff.

On November 19, 2001, however, plaintiff reopened his application for privileges at COCH. The COCH Credentialing Committee consisted of Cross, Marius Koning, Pamela Jo Irby, defendant Daniel Murphy, and Sheryl Norris. The Medical Executive Committee, which considered the renewal of plaintiff's privileges, consisted of Cross, H. Derek Palmer, and defendant Michael Price. Diegel was presented at the meetings of both committees. Both committees, in considering

---

[4]The NPDB is a flagging system intended to facilitate a comprehensive review of health care practitioners' professional credentials. Adverse actions taken with respect to staff privileges are reported by NPDB to state licensing boards and health care entities.

4 - ORDER

plaintiff's application, relied on a summary prepared by Diegel. Both committees recommended denying plaintiff's request for hospital staff privileges at COCH. Plaintiff appealed the committees' recommendations under COCH's Fair Hearing Plan, and a hearing before a three-member physician panel was held on May 30, 2002. That panel heard testimony from plaintiff as well as staff members who alleged that plaintiff had acted inappropriately.

On August 1, 2002, the hearing panel recommended to the CHS Board of Directors that it reconsider plaintiff's request for reappointment to the medical staff of COCH subject to plaintiff's agreement to certain conditions. Plaintiff accepted the panel's recommendation. However, on November 13, 2002, the CHS Board of Directors announced that, based on an independent recommendation by an ad-hoc committee consisting of board members and physicians, it was rejecting the hearing panel's decision and denying plaintiff's application for privileges at COCH. The five member ad-hoc committee included Diegel, Cross, and Price.

One week after the Board of Directors issued its announcement, plaintiff was informed that COCH had reported the denial of his application to the Oregon Board of Medical Examiners ("OBME"). Plaintiff believes COCH also reported the denial to NPDB.

Following the Board of Director's decision to deny his application, plaintiff made a request for active medical staff membership at CHS' Bend hospital, St. Charles Medical Center. On June 13, 2003, plaintiff received a letter from St. Charles Medical Center stating that plaintiff would have to fill out an application and provide it with a letter authorizing the credentials committee and executive committee to review all the information concerning the circumstances of the non-renewal of his membership to the active staff and privileges at COCH. Plaintiff did not respond to that letter. To date, plaintiff has not obtained staff privileges at St.Charles.

5 - ORDER

Following an investigation, on July 11, 2003, OBME announced that it had found no evidence to establish that plaintiff had violated the Medical Practices Act. Plaintiff filed the action presently before the court on September 5, 2003.

In his amended complaint, plaintiff brings the following claims: (1) a claim for violation of the Sherman Antitrust Act and Oregon's antitrust act, against all defendants; (2) a claim for violation of 42 U.S.C. § 1981 (race discrimination) against CHS, Diegel, Cross, Murphy and Price; (3) a claim for violation of 42 U.S.C. § 1985 (race discrimination) against CHS, Diegel, Cross, Murphy and Price; (4) a claim for violation of Title VI (race discrimination) against CHS; (5) a claim for breach of contract against CHS; (6) a claim for negligence against CHS; and (7) a claim for intentional interference with economic relations and prospective economic relations against all defendants except CHS. Defendants now seek summary judgment on all claims.

## STANDARD OF REVIEW

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); Bahn v. NME Hosp's, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party must carry the initial burden of proof. This burden is met through identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Id. The facts on which the opponent relies must be admissible at trial, although they need not be presented in admissible form for the purposes of opposing the summary judgment motion. Id.

6 - ORDER

The court must view the evidence in the light most favorable to the nonmoving party. Bell
v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the
existence of a genuine issue of fact should be resolved against the moving party. Hector v. Wiens,
533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed
in the light most favorable to the party opposing the motion. Valadingham v. Bojorquez, 866 F.2d
1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment
is inappropriate. Sankovich v. Insurance Co. Of North America, 638 F.2d 136, 140 (9th Cir. 1981).

Deference to the non-moving party does have some limit. The non-moving party "must set
forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis
added). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-
moving party, there is no genuine issue for trial." Matsushita Electric Industrial Co., Ltd. v. Zenith
Radio Corporation, 475 U.S. 574, 587 (1986). The "mere existence of a scintilla of evidence in
support of the plaintiff's position would be insufficient." Anderson v. Liberty Lobby Inc., 477 U.S.
242, 252 (1986). If the evidence is merely colorable, or is not significantly probative, summary
judgment may be granted. Id. at 248. However, trial courts should act with caution in granting
summary judgment, and may deny summary judgment "in a case where there is reason to believe that
the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## DISCUSSION

### I.    Plaintiff's antitrust claims

Plaintiff's  federal antitrust claims are based on Section 1 and Section 2 of the Sherman Act,

15 U.S.C. §§ 1-2.[5]  Those sections provide, in relevant part, that:

> Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . .
>
> Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . .

The court will consider each section in turn.

## A.    Section 1 of the Sherman Antitrust Act

Section 1 of the Sherman Act prohibits contracts and conspiracies "in restraint of trade." To establish a violation of Section 1, "a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., an 'antitrust injury')." McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811 (9th Cir. 1988).[6]  Because the court concludes that there is inadequate evidence supporting plaintiff's claim

---

[5]For purposes of this motion, the Oregon antitrust statutes, ORS 646.725 and ORS 646.730, overlap the Sherman Act entirely, and the disposition of the state claims will be identical to that of the federal claims.  See Oregon Laborers-Employers Health and Welfare Trust Fund v. Phillip Morris, Inc., 185 F.3d 957, 963 at n.4 (9th Cir. 1999).

[6]Ordinarily, whether alleged concerted action is such an unlawful restraint is analyzed under the "rule of reason." Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 (1997). However, in some cases, the alleged restraint, if proven, is so manifestly anti-competitive in nature and lacking in any redeeming value that they are declared illegal per se, with no need to apply the rule of reason balancing factors. Id. at 50. Here, the court cannot say that the alleged conduct of the parties would, if proven, be so anti-competitive as to warrant a finding of per se illegality.  See, e.g., Oltz v. St. Peters Community Hospital, 861 F.2d 1440 (9th Cir. 1988) (appropriate analysis was rule of reason). As such, the rule of reason analysis applies here.

8 - ORDER

of a conspiracy, only that element is analyzed.

### a.    Applicable law on antitrust conspiracy

A "contract, combination, or conspiracy" under the antitrust laws may be defined as concerted action intended to achieve a common goal. T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 632-33 (9th Cir. 1987). To establish a conspiracy, a plaintiff must present "direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Wilcox v. First Interstate Bank, 815 F.2d 522, 525 (9th Cir. 1987) (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)). A conspiracy cannot be inferred from parallel conduct absent an inquiry into the motivation of the alleged conspirators, although proof of motivation is not required if there exists direct evidence of collaboration or other probative circumstantial evidence (beyond evidence of mere parallel conduct) from which to infer an agreement. See Wilson Industries, Inc. v. Chronicle Broadcasting Co., 794 F.2d 1359, 1365 (9th Cir. 1986). Unilateral conduct by a single entity does not implicate Section 1 of the Sherman Act regardless of the magnitude of the restraint on competition. The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1152 (9th Cir. 1988).

There is also a special consideration regarding the summary judgment analysis of the conspiracy element of a Section 1 claim. As noted by the United States Supreme Court, "antitrust law limits the range of permissible inferences from ambiguous evidence." Matsushita, supra. In particular, evidence of conduct that is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Monsanto, 465 U.S. at 764. In such cases, the Court has required that "[t]o survive a motion for summary judgment

9 - ORDER

. . ., a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." <u>Matsushita</u>, <u>supra</u> (quoting <u>Monsanto</u>).

Therefore, a defendant moving for summary judgment in an antitrust case under § 1 has the initial burden of identifying the portions of the materials on file that it believes show an absence of a genuine issue of material fact with respect to the conspiracy. Where there is no direct evidence of a conspiracy, the defendant may discharge its summary judgment burden by proffering a "plausible and reasonable" alternative interpretation of its conduct that rebuts the plaintiff's allegation of conspiracy. <u>See</u> <u>O.S.C. Corp. v. Apple Computer, Inc.</u>, 792 F.2d 1464, 1467-68 (9th Cir. 1986); <u>Barnes v. Arden Mayfair, Inc.</u>, 759 F.2d 676, 680 (9th Cir. 1985). The plaintiff must then come forward with direct or circumstantial evidence - <u>i.e.</u>, "specific facts" - capable of sustaining a rational inference of conspiracy and tending to exclude the possibility that the defendant acted independently of the alleged co-conspirators, and thus lawfully. <u>See</u> <u>Monsanto</u>, 465 U.S. at 764; <u>Barnes</u>, 759 F.2d at 680.

In summary, although the Supreme Court has not abandoned the presumption that summary judgment is disfavored in complex antitrust cases that involve issues of motive and intent, <u>see</u> <u>Poller v. Columbia Broadcasting Sys.</u>, 368 U.S. 464, 473 (1962), the Court has imposed an additional requirement in certain cases. Where an antitrust plaintiff's allegation of a conspiracy is based solely on indirect evidence that is capable of inferences of both lawful and unlawful behavior, the plaintiff must produce some evidence tending to exclude the possibility that the defendant acted independently. If the plaintiff cannot produce such evidence, a grant of summary judgment in favor of the defendant is appropriate. <u>See</u> <u>Matsushita</u>, <u>supra</u>; <u>Souza v. Estate of Bishop</u>, 799 F.2d 1327,

10 - ORDER

1329-30 (9th Cir. 1986); <u>Wilson Industries</u>, 794 F.2d at 1362, 1365-66.

     **b.**    **Analysis in this case**

     A threshold matter in considering allegations of conspiracy is to determine the identity of the alleged conspirators and the content of the alleged conspiracy.  <u>T.W. Elec. Service</u>, 809 F.2d at 633. The court looks to the complaint to make such determinations.  <u>Id.</u>

     In plaintiff's amended complaint, paragraph 109 sets forth the necessary information: plaintiff alleges that "[d]efendants, and each of them, entered into a conspiracy to effectively boycott Dr. Ford's practice as a M.D. anesthesiologist, solo practitioner, fee for service and preclude him from continued competition in the Central Oregon marketplace."  While this statement is capable of differing interpretations, when combined with plaintiff's arguments in responding to the motions for summary judgment it is clear that the alleged conspiracy is one between CHS (and the individual CHS defendants) and BAG, and that the conspiracy was to eliminate plaintiff as a competitor to BAG.[7]

     As noted above, a conspiracy can be shown through direct or circumstantial evidence.  Here, however, plaintiff's Section 1 claim cannot survive summary judgment because he has presented

---

     [7]Thus, it does not appear that plaintiff is alleging a conspiracy <u>amongst</u> the CHS defendants. In any event, such an allegation would fail, because the CHS defendants - CHS, Diegel, and Drs. Cross, Price and Murphy - do not have any independent interests vis a vis Dr. Ford's continued practice at the Redmond hospital.  None of the medical staff were in competition with Dr. Ford for provision of anesthesiology services.  <u>Compare</u> <u>Oltz v. St. Peter's Community Hosp.</u>, 861 F.2d 1440, 1450 (9th Cir. 1988) (finding of conspiracy permissible upon evidence of direct competition on the part of the hospital staff who allegedly conspired with the hospital); <u>see</u> <u>also</u> <u>Oksanen v. Page Memorial Hosp.</u>, 945 F.2d 696, 702 (4th Cir. 1991), <u>cert.</u> <u>denied</u>, 502 U.S. 1074 (1992); <u>Patel v. Scotland Memorial Hosp.</u>, 1995 WL 319213 (M.D.N.C. 1995) at *4 (no conspiracy possible between hospital staff and hospital absent personal financial motive on the part of the staff).  On the record before it, the court finds that there is not a genuine issue of material fact on whether the medical staff and the hospital could enter into a conspiracy against plaintiff, and would grant summary judgment in favor of the CHS defendants if plaintiff intended to alleged such a conspiracy.

11 - ORDER

neither kind of evidence sufficiently tending to prove that the CHS defendants and BAG "had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto, 465 U.S. at 764.

First, the court notes that plaintiff has not produced any direct evidence in support of his conspiracy theory. As noted by the Ninth Circuit, "[d]irect evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." 7-Up Bottling Co. v. Archer Daniels Midland Co., 191 F.3d 1090, 1093-94 (9th Cir. 1999) (quote marks and citation omitted). None of plaintiff's CHS-BAG conspiracy evidence satisfies that test. Rather, plaintiff's evidence consists of a series of meetings and communications between CHS or one or more individual CHS defendants and BAG, none of which even directly refers to plaintiff or his position at the hospital in any meaningful way. Plaintiff also relies on internal communications within BAG, and communications between BAG and prospective BAG employees; again, none of these provide direct evidence of a plot between BAG and CHS to exclude plaintiff from the anesthesiology market in Central Oregon. Although the meetings and communications show that BAG was at the table with CHS in discussing the possibility of BAG serving the Redmond hospital, a factfinder would have to make over-reaching inferences from the fact that those meetings took place to conclude that BAG was conspiring with CHS to eliminate competition from plaintiff.

Similarly, based on the standard set forth in Matsushita, the court finds that although plaintiff does present circumstantial evidence in support of his claim, such evidence is insufficient to survive summary judgement.

All defendants have shown "plausible and reasonable" reasons for the conduct complained

12 - ORDER

of by plaintiff.  CHS and the CHS defendants' actions in meeting with BAG are reasonable and consistent with a health care provider expecting growth and wanting to bring in an expanded anesthesiology service to meet expected needs.  BAG's actions in meeting with CHS - an entity which consists in part of the hospital that BAG had been serving for many years - to discuss the possibility of serving additional CHS hospitals was not unreasonable; indeed, it should be expected that a for-profit professional corporation would examine whether expanding its service area would be sensible.  As such, the burden shifts to plaintiff to "provide specific evidence tending to show that the [defendants were] not engaging in permissible competitive behavior . . . [and] tending to exclude the possibility that defendants acted independently."  7-Up Bottling Co., 191 F.3d at 1094; see also Matsushita, supra.  Even viewed in the light most favorable to plaintiff, none of the evidence provided makes such a showing.  Rather, the evidence shows that CHS wanted BAG to service the Redmond hospital, that BAG was willing to consider servicing the Redmond hospital, and that CHS terminated and/or failed to renew plaintiff's hospital privileges, without any specific evidence linking the events.  Assuming, arguendo, that there was something indicating that BAG had participated in the termination or failure to renew plaintiff's privileges, or affirmatively influenced CHS to do so, such could be actionable under Section 1 of the Sherman Act, because of the clear inference of intent.  However, there is simply no evidence here that BAG did so.  To the contrary, all the evidence supports the conclusion that CHS made that decision without input by BAG.  Speculation or conjecture, which is the only way a factfinder could make such a link, is not a substitute for evidence.

In the absence of direct or adequate circumstantial evidence of a conspiracy, summary judgment on plaintiff's Section 1 claim, and the corollary state law claim, must be granted.

13 - ORDER

B.    **Section 2 of the Sherman Antitrust Act**

Section 2 of the Sherman Act prohibits monopolies, as well as attempts to monopolize and

conspiracies towards monopolization.

1.    **Applicable law**

To make out a claim of monopolization, plaintiff must show: (1) defendant's possession of

"monopoly power" in the relevant market; (2) defendant's willful acquisition or maintenance of that

power through exclusionary conduct; and (3) causal antitrust injury. American Prof'l Testing Serv.,

Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publications, Inc., 108 F.3d 1147, 1151 (9th Cir.

1997); see also United States v. Grinnell Corp., 384 U.S. 563 570-71 (1966). Any person "injured

in his business or property" by such monopolization may bring suit for treble damages under Section

4 of the Clayton Act, 15 U.S.C. § 15(a).

To make out a claim for attempted monopolization, plaintiff must show: "(1) that the

defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to

monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc.

v. McQuillan, 506 U.S. 447, 456 (1993); cf Hunt Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d

919, 926 (9th Cir. 1980) (conspiracy to monopolize similar to attempt to monopolize).

Monopoly power, commonly referred to as market power, is defined as "the power to control

prices or exclude competition." Grinnell Corp., 384 U.S. at 571. Because direct evidence of the

power to control prices or exclude competitors is rarely available, courts generally rely on

circumstantial evidence of market power. United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C.

Cir. 2001).

In order to establish a defendant's market power by circumstantial evidence, a plaintiff must

14 - ORDER

"(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and . . . that existing competitors lack the capacity to increase their output in the short run." <u>Rebel Oil, Inc. v. Atl. Richfield Co.</u>, 51 F.3d 1421, 1434 (9th Cir. 1995); <u>see also</u> <u>Western Parcel Exp. v. United States Parcel Service of America, Inc.</u>, 190 F.3d 974, 975 (9th Cir. 1999).

Neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent barriers to new entry or expansion. <u>Americal Prof'l Testing</u>, 108 F.3d at 1154; <u>Rebel Oil</u>, 51 F.3d at 1439.  The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preference for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale.  <u>American Prof'l Testing</u>, 108 F.3d at 1154.

### 2.    <u>Analysis in this case</u>

As a threshold matter, the court notes that plaintiff relies on the same set of facts, and same allegations, in his Section 2 claim as he does in his Section 1 claim.  Thus, the claim is listed against all defendants, although the complained of monopoly appears to be the exclusive provision of anesthesia services in the Central Oregon area by BAG.

However, even assuming, <u>arguendo</u>, that plaintiff's allegation would state a claim upon which relief could be granted, the court notes that BAG is <u>not</u> the exclusive provider of anesthesia services for Central Oregon.  It is undisputed that the Redmond hospital, for example, uses CRNAs for a significant proportion of its anesthesia services, and has done so both during and after plaintiff's practice there.  As plaintiff himself notes in his complaint, the Oregon Association of Nurse Anesthetists reports that CRNAs provide over 80% of the anesthesia in Oregon's rural communities,

15 - ORDER

including Central Oregon.[8]

Although plaintiff attempts to describe the relevant market as consisting of M.D. anaesthesiology services for Central Oregon, the court is not convinced that such a narrow market definition is warranted. Although it is suggested that there are some particularly complex situations that would require an M.D. anesthesiologist's services, it is not seriously contended that CRNAs cannot or do not competently provide anesthesia services in the majority of situations. The court finds that on the record before it, it cannot reasonably be said that CRNAs do not compete with M.D. anesthesiologists for the provision of anesthesia services in Central Oregon. See, e.g., Oltz, 19 F.3d at 1314.

With that finding, it is readily apparent that BAG does not have, and is not close to having, monopoly power over the provision of anesthesia services in Central Oregon. As noted above, there are multiple hospitals in Central Oregon, most of which use CRNAs for most or all of their anesthesia needs. The Redmond hospital itself has had between one and three CRNAs on staff during all times relevant to this complaint. And although in Bend there may be little or no reliance on CNRAs for anesthesia services, Bend alone is not the relevant market.[9]

---

[8]It appears from the record that St. Charles Medical Center, in Bend, does not rely to the same extent on CNRAs as do the rural hospitals, and that there may be less - or no - competition from them for the BAG anesthesiologists who practice there. However, to the limited extent that plaintiff defined the relevant market at all, it was defined as "Central Oregon," not Bend, and the court notes that there are multiple other hospitals in the Central Oregon marketplace that use CNRAs, including the Redmond, Prineville and Madras hospitals.

[9]The court also notes that even if Bend alone was the relevant market, and even if St. Charles does not use CRNAs, it would still be far from certain that BAG has an illegal monopoly there. Plaintiff himself enjoyed visiting privileges at St. Charles during the time that BAG is alleged to have had an exclusive arrangement with the hospital, and did occasionally practice there, and at oral argument BAG commented that no non-BAG M.D. anesthesiologist that has applied has ever been denied privileges there.

16 - ORDER

Because no reasonable factfinder could find that BAG possesses, or is close to possessing, monopoly power over the provision of anesthesia services in Central Oregon, plaintiff's Section 2 claim cannot stand. Summary judgment on that claim, and the corollary state law claim, is granted in favor of defendants.

## II.   **Plaintiff's racial discrimination claims**

Plaintiff also brings claims that the CHS defendants unlawfully deprived him of his rights and privileges under law through 42 U.S.C. §§ 1981 and 1985(3), and 42 U.S.C. § 2000(d) by discriminating against him because of his race.

### A.   **Applicable law**

42 U.S.C. § 1981 provides, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make an enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no more.

The Ninth Circuit has held that a claim under § 1981 is governed by the same substantive standards applicable to race-based challenges brought pursuant to Title VII of the Civil Rights Act of 1964, and is subject to the same burden-shifting analysis. Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate, 416 F.3d 1025, 1039-39 (9th Cir. 2005); see also Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989), reversed on other grounds by the Civil Rights Act of 1991, Pub.L.No. 102-166, § 101 (1991). Plaintiff must present facts from which a jury could conclude that he was intentionally discriminated against. Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531, 537 (9th Cir. 1982).

17 - ORDER

To establish a prima facie case of discrimination, a plaintiff must offer proof: (1) that the plaintiff belongs to a protected class; (2) that the plaintiff performed his job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to plaintiff's protected class. Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The requisite degree of proof necessary to establish a prima facie case is generally minimal, and does not even need to rise to the level of a preponderance of the evidence. See Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.' . . . Establishment of a prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Id. (citations omitted). To rebut this presumption, the defendant must produce admissible evidence showing that the defendant undertook the challenged employment action for a "legitimate, nondiscriminatory reason." McDonnell Douglas, 411 U.S. at 802. If the defendant does so, then "the presumption of discrimination 'drops out of the picture'" and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required in civil cases under Fed.R.Civ.P. 56(c). See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). Summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of intentional discrimination based on the plaintiff's race. See Wallis, supra, 26 F.3d at 889.

42 U.S.C. § 1985(3) prohibits two or more persons from conspiring to deprive any person or a class of persons of the equal protection of the law. A plaintiff alleging a conspiracy under §

18 - ORDER

1985(3) must establish: (1) the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy; and (3) a resulting injury.  Scott v. Ross, 140 F.3d 1275, 1284 (9th Cir. 1998); Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1539 (9th Cir. 1992).

Finally, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides in pertinent part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial aid."  To prevail on a claim for damages under § 2000d, plaintiff must prove that: (1) the entity involved is engaging in racial discrimination; and (2) the entity involved received federal financial assistance.  Fobbs v. Holy Cross Health System Corp., 29 F.3d 1439, 1447 (9th Cir. 1994), overruled on other grounds.  Plaintiff must present facts from which a reasonable jury could conclude that the discrimination was intentional.  Id.  Additionally, although the Ninth Circuit does not appear to have squarely addressed the issue in an employment context, relevant cases considering similar issues strongly suggest that a Title VI plaintiff with employment-based claims must show that the primary purpose of the federal financial assistance is to provide employment.  See Maldonado v. City of Altus, 433 F.3d 1294, 1302-03 (10th Cir. 2006); see also Reynolds v. School Dist. 1., 69 F.3d 1523, 1531 (10th Cir. 1995) (citing supporting language from the Supreme Court and similar caselaw from the Second, Fourth, Seventh, Eighth and Ninth Circuits); 42 U.S.C. § 2000d-3.

**B.    Analysis in this case**

Plaintiff has demonstrated sufficient facts to allow his § 1981 claim to go forward.

It is not disputed that plaintiff is a member of a protected class.  Further, he has provided

19 - ORDER

evidence from which a factfinder could reasonably find that he was competent to provide the services expected of a licensed anesthesiologist, and that the actions of the hospital in refusing to continue to extend him staff privileges constituted an adverse employment action.  Finally, plaintiff has provided evidence that other, Caucasian physicians - who had likewise been the subject of various complaints or concerns - were not subject to the same adverse employment action, but instead have been allowed to maintain their staff credentials.[10]  Plaintiff has therefore met his burden of establishing a prima facie case of discrimination, with the resulting presumption of discrimination.

For their part, the CHS defendants have also met their burden of rebutting that presumption. Defendants have pointed to a series of complaints against plaintiff brought by several staff members alleging sexually harassing conduct, and have provided evidence that plaintiff had previously been verbally chastised for making similar inappropriate remarks.  In the face of the immediate rash of complaints and the history of prior conduct, refusing to re-credential plaintiff could reasonably said to be a legitimate, non-discriminatory decision.

With the the presumption of discrimination thus "dropp[ing] out" of the equation, the question becomes whether plaintiff has provided evidence from which a reasonable factfinder could conclude that the stated non-discriminatory reason is merely a pretext for discrimination, and that the real reason for the employment decision was intentional discrimination on the basis of plaintiff's race.  Plaintiff has met his burden of providing such evidence.

_____

[10]Although the CHS defendants argue that the Caucasian doctors are not fair comparisons because they were not identically situated with plaintiff, the court finds that their situations - which involve such things as verbal threats to other staff and alleged drinking on the job - are close enough to the harassment and inappropriate behavior allegations brought against plaintiff to use them for comparison, especially when one considers the hospital's rationale in refusing plaintiff privileges was largely patient and staff safety.

20 - ORDER

As mentioned above, there is evidence in the record that although plaintiff was not allowed to continue practicing at the Redmond hospital, several Caucasian physicians who had complaints or concerns lodged against them were not similarly barred.[11]  Additionally, there is evidence in the record that at least one other non-Caucasian physician, a surgeon (Dr. Daryl Choo), who had enjoyed privileges at the Redmond hospital as part of a three-doctor practice had been, in essence, uninvited, while his colleagues were not similarly treated.[12]  A reasonable jury could conclude from the whole of the record that the CHS defendants violated the plaintiff's rights under § 1981 by intentionally discriminating against him on the basis of his race.

Similarly, a genuine issue of material fact exists as to whether some of all of the CHS defendants were engaged in a conspiracy to deprive plaintiff of his rights.  Although for purposes of the Sherman Act claims the CHS defendants would be incapable of conspiring together because their interests were essentially wed, such is not necessarily the case regarding plaintiff's civil rights claims.  Some or all of the individual CHS defendants could have harbored a racially-discriminatory animus against plaintiff and conspired with each other to deprive him of his rights outside the boundaries of their responsibility to the hospital.  Given that the only body without the individual CHS defendants as members - the Hearing Panel - recommended granting plaintiff privileges, that

---

[11]To the extent that the CHS defendants argue that claims against the Caucasian doctors were investigated and found to lack merit or to be insufficient to warrant termination of privileges, the court notes that a jury could conclude from the record that prior to informing plaintiff that his application for renewal of privileges would be denied the hospital did not provide him the benefit of such an investigation.  Further, the one body that clearly took significant evidence regarding the complaints against plaintiff - the Hearing Panel - was the one body that recommended reinstating plaintiff with certain conditions.  Its recommendation was then rejected by the ad hoc committee.

[12]Dr. Price allegedly told Dr. Choo's colleagues that if Dr. Choo continued to be with their practice, Dr. Price and his medical group would cease referring patients to their practice.

21 - ORDER

every committee with some or all of the individual defendants recommended denying plaintiff privileges, and that, as described above, a reasonable jury could conclude that the denial of privileges was motivated by racial discrimination, plaintiff has provided sufficient evidence to allow a reasonable jury to find that some or all of the individual defendants were engaged in a conspiracy to achieve that end.

However, plaintiff has not provided any evidence from which a reasonable jury could conclude that any federal funds received by CHS were intended to provide employment. This claim was not heavily briefed or fully discussed at oral argument; however, in reviewing the record, the court has not found any material indicating in what way the hospital receives federal funding or whether some or all of that funding is intended to provide employment. Certainly the court has not found a nexus between that funding and the discriminatory practices alleged by plaintiff. As such, summary judgment on plaintiff's § 2000d claim is granted in favor of CHS.

III.    **Plaintiff's breach of contract claim**

As his fifth claim for relief, plaintiff alleges that the hospital bylaws are a contract between plaintiff and the hospital, and that by failing to follow certain policies within the bylaws - to wit, the sexual harassment policy, the disruptive conduct policy, and the fair hearing plan - the hospital breached the contract. CHS seeks summary judgment on this claim on the basis that the bylaws are not an enforceable contract between plaintiff and the hospital.

CHS bases its argument on the fact that under ORS 441.055(3) and (4) and OAR 333-505-0020, the hospital is charged with selecting a medical staff and the medical staff is required to propose bylaws for their governance, that as such the hospital was under a pre-existing duty to create bylaws benefitting the medical staff, and that therefore there was no independent consideration given

22 - ORDER

by plaintiff to create an enforceable contract.  No Oregon cases are on point, but there are at least

some cases that have held as defendants suggest.  See, e.g., O'Byrne v. Santa Monica-UCLA Medical

Ctr., 94 Cal.App.4th 797 (2001).

However, the better reasoned cases have found to the contrary.  For example, in Virmani v.

Presbyterian Health Services Corp., 127 N.C.App. 71, 488 S.E.2d 284 (1997), the court stated that:

> We acknowledge the general rule that the promise to perform an act which the
> promisor is already bound to perform cannot constitute consideration to support an
> enforceable contract.  Thus the mere enactment of a set of bylaws pursuant to the
> statute is a preexisting duty and cannot itself constitute consideration for the
> formation of a contract.  When, however, a hospital offers to extend a particular
> physician the privilege to practice medicine in that hospital it goes beyond its
> statutory obligation.  If the offer is accepted by the physician, the physician receives
> the benefit of being able to treat his patients in the hospital and the hospital receives
> the benefit of providing care to the physician's patients.  If the privilege is offered and
> accepted, each confers a benefit on the other and these benefits constitute sufficient
> and legal consideration for the performance of the contract.  If the offer includes a
> condition that the physician be bound by certain bylaws promulgated by the hospital
> and the physician accepts the offer, those bylaws become a part of the contract, as
> there is mutual assent to be bound by the bylaws.

Id., S.E.2d at 288 (citations omitted).  Here, plaintiff's appointment was subject to the terms and

conditions of the bylaws he now seeks to enforce.  Upon his acceptance of the hospital's offer of staff

privileges, the bylaws became part of plaintiff's employment agreement with the hospital supported

by the consideration of his agreement to practice there, and that agreement is an enforceable contract.

Although there is no Oregon case on point dealing with Oregon's statutory scheme, most

jurisdictions that have considered the question have reached a similar conclusion.  See, e.g., Janda

v. Madera Community Hosp., 16 F.Supp.2d 1181, 1184 (E.D.Cal. 1998) (recognizing a split of

authority but noting that "the majority of jurisdictions have held that hospital bylaws, when approved

and adopted by the governing board, are a binding and enforceable contract between the hospital and

23 - ORDER

physicians."). CHS' motion for summary judgment on plaintiff's breach of contract claim is denied.[13]

IV.     **Plaintiff's negligence claim**

As his sixth claim for relief, plaintiff alleges that the hospital was negligent in failing to adequately process his June 2001 application for staff privileges, and in failing to enforce its Sexual Harassment and Disruptive Conduct policies, resulting in the cascade of events occurring in October 2001 leading to the termination of his privileges. CHS seeks summary judgment on this claim on the bases that there was no special relationship between the parties and that plaintiff was at greater fault than the hospital, precluding his claim against it.

On the failure to enforce policies allegation, the court finds that plaintiff's negligence claim must fail for want of a "special relationship" between the parties. Although Oregon law recognizes that in some circumstances a breach of contract can give rise to tort liability, "[t]he modern cases carry forward and refine the basic idea that a tort action between parties to a contract can arise when the plaintiff's damages result from breach of an obligation that is independent of the terms of the contract, that is, an obligation that the law imposes on the defendant because of his or her relationship to the plaintiff, regardless of the contract between them." Jones v. Emerald Pacific Homes, Inc., 188 Or.App. 471, 476 (2003) (citing Conway v. Pacific University, 324 Or. 231, 237 (1996); Georgetown Realty v. The Home Ins. Co., 313 Or. 97, 106 (1992); Securities-Intermountain

---

[13]CHS' argument in the alternative that plaintiff breached the contract first and therefore CHS cannot be in breach is not well taken. Plaintiff alleges that CHS did not provide him the process required by the bylaws as a result of the accusations leveled against him; the hospital cannot relieve itself of that obligation by conclusory statements that because those charges were made the plaintiff breached the agreement and the process was therefore not required. Regardless, the better course for purposes of evaluating what actually occurred - both in terms of plaintiff's conduct and CHS' response - it to allow a jury to hear the evidence and make its own determination.

24 - ORDER

v. Sunset Fuel, 289 Or. 243, 259 (1980); Kisle v. St. Paul Fire & Marine Ins., 262 Or. 1, 6-7 (1972)).

The Jones court summarized the state of the law, noting that "parties to a contract are in a 'special relationship' imposing a heightened duty of care and thereby creating potential tort liability when one party delegates to the other the authority to make important decisions with the understanding that the authority is to be exercised on behalf of and for the benefit of the authorizer." Id. at 478.

As the basis for plaintiff's "failure to enforce" negligence claim stems solely from the existence of the contract between the parties, plaintiff must demonstrate the existence of such a "special relationship" to maintain those claims. This he has not done. Nothing in the record suggests that plaintiff authorized the hospital to exercise authority on his behalf; he did not entrust his personal or financial health to the hospital, for example. The hospital did not take on the role of a professional advisor or fiduciary. The bylaws at issue are standard employment fare, designed to ensure that employees are treated fairly and equitably when allegations are brought against them while setting out procedures to investigate the complaints. No duty, beyond the contract itself, was created. As such, this portion of plaintiff's negligence claim fails.

However, the allegation that the hospital was negligent in processing plaintiff's application for privileges necessitates something of a different analysis. Although also a topic of hospital bylaws, the procedures for processing an application for privileges are applicable to candidates regardless of whether they are in a contractual relationship with the hospital; in other words, plaintiff, even in the absence of a contract with the hospital, would still be entitled to the benefit of the statutorily-mandated policies for granting privileges.[14] A plaintiff's tort claim may exist "even if it is based on an obligation that the defendant assumes as an express or implied term of the

---

[14]See ORS 441.055(3)(c).

contract, so long as the obligation would exist even if it were not in the contract." Georgetown Realty, supra, 313 Or. at 106. Because plaintiff was owed the benefit of the hospital's policies and procedures for timely consideration of an application for staff privileges irrespective of his contract with the hospital, his negligence claim on that basis can proceed.[15]

## V.    Plaintiff's intentional interference with economic relations claim

As his seventh claim for relief, plaintiff alleges that all defendants except CHS unlawfully interfered with his economic relations - i.e., his ability to practice medicine at the Redmond hospital. Defendants seek summary judgment on this claim, arguing that there was no such interference, and that plaintiff cannot show an improper means or an improper purpose.

To state a claim for tortious interference with economic relations, a plaintiff must demonstrate: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal relationship between the interference and damage to the economic relations; and (6) damages. Volm v. Legacy Health Sys., 237 F.Supp.2d 1166, 1176 (D.Or. 2002) (citing McGanty v. Staudenraus, 321 Or. 532 (1995)).

It is apparent, based on the above determination on plaintiff's antitrust claim, that BAG cannot be said to have tortiously interfered with plaintiff's practice. As previously mentioned, no reasonable factfinder could conclude that BAG was at all involved in the decision to terminate, or fail to renew, plaintiff's staff privileges. Because there is no evidence of interference, plaintiff's

---

[15]CHS' argument that plaintiff was at fault at a greater percentage than the hospital, and that he therefore cannot maintain a negligence claim against it, is better considered by a jury who can consider all the evidence surrounding the hospital's policy regarding applications for privileges and what plaintiff and CHS did, and did not do, in processing plaintiff's application.

26 - ORDER

claim against BAG must fail.

However, there is evidence in the record from which a factfinder could conclude that the events culminating in the revocation of plaintiff's privileges occurred because of racial discrimination on the part of some or all of the CHS defendants. If a jury found that the CHS defendants caused the revocation of his privileges, and did so out of a racial animus, such would constitute interference and an unlawful purpose. See, e.g., Engquist v. Oregon Dept. of Agriculture, 2004 WL 792790 at *16 (D.Or. 2004) ("[T]he court finds that plaintiff has offered evidence sufficient to raise questions of fact as to whether Szczepanski and Hyatt developed and implemented a plan to terminate plaintiff because of her race, gender, and/or national origin. Accordingly, it is for a finder of fact to determine whether Szczepanski and Hyatt . . . interfered intentionally with plaintiff's contractual relationship."). As such, the claim can proceed against the individual CHS defendants.

## VI.    Defendants' immunity defenses

The Health Care Quality Immunity Act of 1986 ("HCQIA") was promulgated to provide limited immunity for hospitals and health care practitioners for their participation in professional peer review proceedings. 42 U.S.C. § 11101 et. seq. To qualify for immunity, the proceeding must have been a review based on the competence or professional conduct of an individual physician that affected, or may affect, the clinical privileges of the physician. 42 U.S.C. § 11151(9). However, the immunity does not apply in cases where the damages suffered by the physician stem from violations of the physician's civil rights. 42 U.S.C. § 11111(a)(1); see also Meyer v. Sunrise Hosp., 117 Nev. 313, 325 n.5 (2001) ("We recognize that there will be instances where the subjective motives of the peer review committee will be relevant in determining HCQIA immunity. For example, when a doctor alleges that she was disciplined because of her race, religion, or sex[.]"). Further, the

27 - ORDER

immunity does not apply if the action taken by the peer reviewers was primarily based on "any . . . matter that does not relate to the competence or professional conduct of a physician."  42 U.S.C. § 11151(9).

The remaining issues in this case involve a breach of contract separate from the peer review process; a claim for negligence separate from the actual review conducted during peer review; conduct that tortiously interfered with plaintiff's economic relations, based on an alleged violation of plaintiff's civil rights; and plaintiff's direct claims for violations of his civil rights.  In none of these claims is application of the HCQIA immunity appropriate.  As such, defendants' request for dismissal of all claims against them, and for their attorney fees, is denied.

Similarly, defendants argue that ORS 41.675 provides immunity for their good faith actions in peer review proceedings.  Even assuming, arguendo, that ORS 41.675 would apply in this action, the remaining claims involving peer review relate to plaintiff's allegations that he was unlawfully discriminated against.  If a jury so found, the defendants' participation would not be in good faith, and immunity would not attach.  See, e.g., Virmani v. Novant Health, 259 F.3d 284, 293 (4th Cir. 2001).  As such, application of the protection of ORS 41.675 is inappropriate.

## CONCLUSION

For the above stated reasons, defendants' motions (## 104, 105) for summary judgment are granted in part and denied in part.  The motions are granted as to plaintiff's anti-trust claims, plaintiff's Title VI claim, plaintiff's negligence claim based on the hospital's failure to enforce bylaw policies, and plaintiff's tortious interference claim against BAG.  The motions are denied as to plaintiff's §§ 1981 and 1985(3) claims, plaintiff's breach of contract claim, plaintiff's negligence claim regarding the processing of his application for privileges, and plaintiff's tortious interference

28 - ORDER

claim against the individual CHS defendants. Because no claims remain against it, defendant BAG

is dismissed as a party to this lawsuit. Defendants are not entitled to the immunity provisions of the

HCQIA or ORS 41.675 on the remaining claims against the CHS defendants.

DATED this $\cancel{21}$ day of June, 2006.

Thomas M. Coffin
United States Magistrate Judge

29 - ORDER